## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## NORTHERN DIVISION

LESLIE G. ESSIF,

     **Plaintiff,**

v.                                                                       No. 3:22-cv-00130-KAC-JEM


DONDE ASHMOS PLOWMAN,                         JURY DEMANDED
AS CHANCELLOR,
UNIVERSITY OF TENNESSEE, KNOXVILLE,

and

JOHN ZOMCHICK,
AS PROVOST and VICE CHANCELLOR,
UNIVERSITY OF TENNESSEE,
KNOXVILLE,

and

THERESA LEE
AS DEAN, COLLEGE OF ARTS & SCIENCES,
UNIVERSITY OF TENNESSEE, KNOXVILLE

     **Defendants.**

---

## SECOND AMENDED COMPLAINT

---

Comes now the Plaintiff, Leslie G. Essif, by and through counsel, and alleges in his

Amended Complaint as follows:

### I.     Introduction

This lawsuit seeks injunctive relief from Defendant Donde Ashmos Plowman, Chancellor

of the University of Tennessee, Knoxville ("University"); Defendant John Zomchick, Provost and

Vice Chancellor of the University; and Defendant Theresa Lee, Dean of the College of Arts and

Sciences of the University due to the wrongful revocation of certain vested and accrued retirement benefits, including the Plaintiff's Professor Emeritus status earned by him due to his distinguished career of research and service and granted by the University in May, 2017.

The Defendants did so based upon a fundamentally unfair investigation by a purportedly neutral fact-finding entity within the University known as the Office of Equity and Diversity ("OED"). OED acted with bias against the Plaintiff in creating its report, particularly given the fact that the Plaintiff was _not_ the perpetrator in the event that spurred the investigation or the Respondent for purposes of the University's investigation of sexual harassment claims against another professor within the Plaintiff's department. The OED Report was then used by the Defendants as a basis to revoke the Plaintiff's Emeritus status and retiree benefits without a hearing.

The event that precipitated the Title IX investigation by the University occurred in September 2016, several years before the 2020-2021 investigation, between a graduate student at the University and another professor in the Plaintiff's department. As relayed by the graduate student to the Plaintiff in 2016, the incident between the other professor and the graduate student, the other professor bothered that graduate student during an off-campus event. The graduate student subsequently approached the Plaintiff about the incident with the other professor. Before disclosing extremely limited information about the incident to the Plaintiff, the graduate student stipulated that the Plaintiff maintain her anonymity and requested that he refrain from reporting to the University. The Plaintiff acted in accordance with the student's wishes for confidentiality and, based on later assurances from the student herself as well as from the Plaintiff's then-department head, the Plaintiff's understanding was that the whole issue had been resolved. However, in 2020, approximately three (3) years after the Plaintiff's retirement as a Professor Emeritus of the

University, the Plaintiff was blindsided by the news that the Defendants had summarily revoked his Professor Emeritus status. The Defendants' actions in classifying the Plaintiff as a respondent for purposes of its Title IX investigation against another professor and summarily revoking the Plaintiff's Professor Emeritus status and certain retirement benefits without a proper hearing, without proper procedure, and without any properly-defined basis to do so violated the Plaintiff's Due Process rights. Just as the Plaintiff held a property interest in his status as a tenured professor prior to his retirement, the Plaintiff holds a vested property interest in his status as Professor Emeritus as well as in his retirement privileges and benefits from the University. The Defendants' actions were further a breach of the Plaintiff's expected contract rights as a retired professor from the University as the Defendants have deprived him of certain retirement benefits, including access to campus facilities and library resources.

## II.     Parties

1.  Plaintiff Leslie G. Essif ("Dr. Essif") is an individual and is a citizen and resident of the State of North Carolina, more particularly residing at 125 Lantern Way, Carrboro, North Carolina 27510. Essif was previously employed by the University as a Professor of French in the Department of Modern Foreign Languages and Literatures from 1994 until his retirement in 2017 during which time he earned Professor Emeritus status based on his accomplishments and service to the University.

2.  At all times material to this Complaint, Defendant Donde Ashmos Plowman, who is being sued in her official capacity, acted as Chancellor of the University and may be served through C. Ryan Stinnett, Office of General Counsel, 505 Summer Place, UT Tower #1155, Knoxville, Tennessee 37902. The University is a land-grant university established and authorized under the laws of the State of Tennessee, which provides undergraduate and

graduate programs of study at multiple campuses throughout the State of Tennessee, including the flagship campus, located in Knoxville, Knox County, Tennessee. The University is a state actor and has empowered her to take administrative action against the Plaintiff under color of state law.

3. At all times material to this Complaint, Defendant John Zomchick, who is being sued in his official capacity, acted as the Provost and Vice Chancellor of the University and may be served through C. Ryan Stinnett, Office of General Counsel, 505 Summer Place, UT Tower #1155, Knoxville, Tennessee 37902. The University is a land-grant university established and authorized under the laws of the State of Tennessee, which provides undergraduate and graduate programs of study at multiple campuses throughout the State of Tennessee, including the flagship campus, located in Knoxville, Knox County, Tennessee. The University is a state actor and has empowered him to take administrative action against the Plaintiff under color of state law.

4. At all times material to this Complaint, Defendant Theresa Lee, who is being sued in her official capacity, acted as the Dean of the College of Arts and Sciences of the University and may be served through C. Ryan Stinnett, Office of General Counsel, 505 Summer Place, UT Tower #1155, Knoxville, Tennessee 37902. The University is a land-grant university established and authorized under the laws of the State of Tennessee, which provides undergraduate and graduate programs of study at multiple campuses throughout the State of Tennessee, including the flagship campus, located in Knoxville, Knox County, Tennessee. The University of Tennessee, Knoxville is a state actor and has empowered her to take administrative action against the Plaintiff under color of state law.

### III.     Jurisdiction and Venue

5. This action was initially filed in the Chancery Court for Knox County, Tennessee on or about March 14, 2022.  On or about April 12, 2022, the Defendants filed a Notice of Removal to this Court pursuant to 28 U.S.C. §1331, 28 U.S.C. §1441, and 28 U.S.C. §1446. Accordingly, this Court has jurisdiction.

6. Injunctive and equitable relief are sought pursuant to 28 U.S.C. §§ 2201 and 2202.

7. Venue is proper in this Court because the Defendants are located in the Eastern District of Tennessee, Northern Division, in which a substantial part of the events and omissions giving rise to this cause occurred.

### IV.     Facts

**Plaintiff Leslie G. Essif's Education, Career, and the 2016 Alleged Sexual Harassment of a Then-Graduate Student by another professor, Professor John Romeiser**

8. Plaintiff Leslie G. Essif ("Dr. Essif") completed his Doctor of Philosophy with distinction in French Studies, concentrating on 19th and 20th Century French Narrative, at Brown University in Providence, Rhode Island in 1991.

9. In 1990-1991, Dr. Essif was a visiting assistant professor at the Université de Bourgogne in Dijon, France.

10. From 1991 until 1994, Dr. Essif was an assistant professor at the University of Louisville in Louisville, Kentucky.

11. In the fall of 1994, Dr. Essif began his distinguished career at the University, serving as Assistant Professor of French.

12. Due to his efforts in teaching and publishing, Dr. Essif earned the title of Associate Professor of French from the University in August, 2000.

13. Thereafter, Dr. Essif earned the title of full Professor at the University in August 2006 where he taught and published on behalf of the University until his retirement in 2017.

14. While serving as professor at the University, Dr. Essif published multiple books and articles, bestowing honor upon the University and contributing to its recognition within the academic community.

15. Dr. Essif received numerous awards recognizing his professorial abilities, including the Chancellor's Excellence in Teaching Award, and a two-year appointment as a winner of the UTK Lindsay Young Professorship from August 2015 until 2017.

16. During his tenure at the University, Dr. Essif advised and shepherded numerous students with their studies, both graduate and undergraduate, and served on multiple dissertation committees.

17. One student in the Department of Modern Foreign Languages and Literatures, who for the purposes of this matter will be called "Jane Doe," often sought Dr. Essif's advice and expertise as she studied French theatre and literature.  In the fall of 2016, Jane Doe was a first-year Master's student in the Department of Modern Foreign Languages and Literatures, having completed the undergraduate program at the University.

**The Fall 2016 event involving Professor John Romeiser and Jane Doe as relayed to Dr. Essif**

18. Early in the fall semester of 2016, sometime in the week prior to September 15, 2016, Jane Doe attended an off-campus event for the graduate students in the University's French Department at a restaurant known as Black Horse Pub in Knoxville, Tennessee.

19. Upon information and belief, during the event at Black Horse Pub, an encounter occurred between Jane Doe and another professor in the French Department at the University, Dr. John Romeiser.

20. In the days following the event at Black Horse Pub, again, sometime in the early Fall of 2016, Jane Doe approached Dr. Essif and asked to speak with him. Jane Doe began by noting that because of their long, fruitful student-teacher and mentor-mentee relationship, he was the one person on the campus of the University whom she trusted enough to handle the situation confidentially. Jane Doe stated to Dr. Essif that he was the *only* person she was approaching about this issue, further insisted on anonymity, explicitly expressed that she did not want to file a formal complaint, and stated that she just wanted to check the situation regarding Dr. Romeiser, before it got out of hand.

21. At the time Jane Doe requested to meet with Dr. Essif, Dr. Essif had not yet had formal training from the University or what would eventually become its Title IX office that indicated there was a requirement to refuse to listen to a student's complaint in the event a student requested confidentiality and anonymity.

22. During the meeting with Dr. Essif, Jane Doe relayed the following events to Dr. Essif: at the Black Horse gathering for the University's French Department, Dr. Romeiser bothered her, primarily by persistent attempts to engage her in conversation. During one of these conversations, while both Jane Doe and Dr. Romeiser were conversing, at one point, Dr. Romeiser briefly placed a hand on Jane Doe's knee. Jane Doe explained to Dr. Essif that Dr. Romeiser had previously displayed this apparently flirtatious inclination to engage her in conversation.

23. Jane Doe further expressed to Dr. Essif that she hoped that he could do something in a discreet and confidential manner in order to stop Dr. Romeiser's behavior without her identity being revealed. Dr. Essif directly asked Jane Doe if she would agree to him approaching the then-department head of the Department of Modern Foreign Languages and

Literatures, Dr. Adrian Del Caro, regarding the issue without revealing her identity.  Jane Doe agreed to Dr. Essif approaching Dr. Del Caro.

24. Under no circumstances did Dr. Essif **ever** attempt to dissuade Jane Doe from making a formal complaint against Dr. Romeiser or **ever** suggest that she should keep the issue within the Department of Modern Foreign Languages and Literatures.

25. Unbeknownst to Dr. Essif in 2016 and contrary to her express representations to him during their meeting in 2016, Jane Doe had already approached a lecturer at the University, Dr. Kenemen, and had initiated some sort of contact with the Title IX office within the University.  This became known to Dr. Essif in 2021 after he finally received a copy of Jane Doe's 2020 complaint against Dr. Romeiser, but was most certainly not known to him in 2016 when Jane Doe spoke with him regarding the issue.

26. Pursuant to Section 3.1(A) of the University's 2016 Policy on Sexual Misconduct, Relationship Violence, and Stalking: "Complainants are not required to report Prohibited Conduct to the University if they do not want the University to respond to the incident or assist with Interim Measures."  (2016 University of Tennessee, Knoxville Policy on Sexual Misconduct, Relationship Violence, and Stalking, Section 3.1(A).  A copy of this policy is attached hereto as *Exhibit A* and shall be referred to herein as "2016 Policy".

27. According to the 2016 Policy disseminated by the University to persons such as Jane Doe, avoiding official channels was a proper course of action if she so wished.

28.  Upon information and belief, per her own wishes, Jane Doe did not follow through with her formal complaint to the University in 2016.

29. On or about September 15, 2016, Dr. Essif met with Dr. Del Caro and directly related Jane Doe's account as presented to him (Dr. Essif) by Jane Doe to Dr. Del Caro.  Acting in good

faith and cognizant of Jane Doe's 2016 stipulations regarding confidentiality and anonymity, Dr. Essif did not reveal Jane Doe's identity to Dr. Del Caro.

30. Dr. Del Caro, who, upon information and belief, at that point in 2016 as a department head, had actually received training on refusal to listen to student requests for confidentiality and anonymity from the University, initially responded by discussing Dr. Essif's willingness to listen to Jane Doe's complaint versus refusing to listen and directing her to other official channels within the University. However, department head Dr. Del Caro did not definitively indicate that a mandatory report to official channels was somehow required. Again, at that time, Dr. Essif had not received formal training from the University or any other information from the University that would indicate to him that refusal to listen to Jane Doe and attempt to assist her as she requested would have been appropriate under the circumstances. Based on the extraordinarily limited information Dr. Essif received from Jane Doe at the time of her disclosure to him in terms of what occurred between her and Dr. Romeiser at Blackhorse Pub, which was not clear that it amounted to Prohibited Conduct pursuant to the University's 2016 Policy, Dr. Essif acted appropriately in approaching his supervisor with the permission of Jane Doe.

31. Also during the conversation between Dr. Essif and Dr. Del Caro on or about September 15, 2016, Dr. Essif expressed his intent to maintain Jane Doe's request for anonymity in an effort to respect her rights as an individual and his belief that if they were to act otherwise, they would be denying her an avenue of support and the potential to resolve the issue.

32. Ultimately, Dr. Del Caro agreed to maintain confidentiality with respect to Jane Doe's identity and told Dr. Essif that he would do what he could in order to resolve the issue and he would contact Dr. Essif if need be.

33. As Jane Doe herself admitted during the University's 2020 Title IX investigation of her allegations against Dr. Romeiser, Dr. Essif acted in good faith in his attempts to assist her in 2016: ***"I want to reiterate that I do not think Dr. Essif had any bad intentions. I think he believed he was looking out for my best interest, and I believe he genuinely wanted to help me."*** (Redacted email from Jane Doe to Nicholas Meanza attached hereto as *Exhibit B*) (***emphasis added***).

34. On or about September 24, 2016, having heard nothing further from any person involved, Dr. Essif sent an email to Dr. Del Caro to follow up on the issue. Two days later, on or about September 26, 2016, Dr. Del Caro responded to Dr. Essif's email, stating that he had already addressed the issue with Dr. Romeiser.

35. In the interim, before Dr. Essif had a chance to speak with Dr. Del Caro again, Jane Doe relayed to Dr. Essif that the problem with Dr. Romeiser was resolved.

36. Based on Dr. Del Caro's email and Jane Doe's representation to him (Dr. Essif) that the issue had been addressed, Dr. Essif believed the issue had been resolved. However, in December 2020, he was blindsided with the news that his Professor Emeritus status and privileges had been summarily revoked by the Defendants without the opportunity for a proper hearing.

**The University's Policies in 2016**

37. Upon information and belief, in 2016, at the time of the incident between Dr. Romeiser and Jane Doe, the then-applicable Title IX policy maintained by the University, was the "Policy on Sexual Misconduct, Relationship Violence, and Stalking" dated "Effective August 17, 2016." (*See Exh. A*)

38. The 2016 Policy for the University is devoid of any policy or procedure for disciplining a

mandatory reporter for alleged failure to disclose to the Title IX office and/or alleged

dissuasion of complainant.  (*See Exh. A*).

39. Pursuant to the University's 2016 Policy, if Dr. Essif would have had sufficient information

from Jane Doe at that time to define Dr. Romeiser's conduct as "Prohibited Conduct," Dr.

Essif would have been, at most, considered to have been a "Mandatory Reporter," which was

defined as:

> A University employee identified in Section 3.1 (non-law enforcement), Section 3.2.1
> (UTPD), and/or Appendices B-C as an option for reporting Prohibited Conduct to the
> University.  Notwithstanding anything in this policy to the contrary, Mandatory Reporters
> do not include persons who are prohibited in this situation from reporting an incident by a
> law or mandatory ethical standard imposed by their profession (e.g., a Qualified Mental
> Health Professional who learns of the information in the course of a privileged provider-
> patient relationship).

(*See* University's 2016 Policy, *Exh. A*, Appendix A, at p. 54-55).

40. A "Mandatory Reporter" is explained in Section 3.1 of the 2016 Policy as follows:

> **<u>Reporting Prohibited Conduct to a University Mandatory Reporter</u>**
>
> **Complainants are not required to report Prohibited Conduct to the University if
> they do not want the University to respond to the incident or assist with Interim
> Measures.**  However, reporting a violation of this policy to the University empowers
> Complainants to obtain the support they need and enables the University to respond
> appropriately, including conducting a prompt, thorough, and equitable investigation and,
> if warranted, taking disciplinary action against a Respondent.  **If a person reports an
> incident of Prohibited Conduct to the University, there is <u>no</u> requirement that the
> Complainant pursue criminal prosecution or University discipline against a
> Respondent**.  The University recognizes that a Complainant's decision on how to
> proceed after a report is a process that may unfold over time; thus, at the time a report is
> made to the University, a Complainant does not have to decide whether to request any
> particular course of action.
>
> **This policy requires certain University employees, called <u>Mandatory Reporters</u>, to
> report information they receive concerning Prohibited Conduct to the University in
> accordance with Section 6.**  Not all University employees are Mandatory Reporters.
> Some University employees are encouraged but are not obligated to disclose Prohibited
> Conduct to the University.  Other University employees, called Confidential Employees

(Section 4.1.1), are legally or ethically prohibited from disclosing Prohibited Conduct to the University.

**The only way for a Complainant (or any other person) to provide notice to the University of an incident of Prohibited Conduct is to report the incident to a Mandatory Reporter.** A Complainant may opt to report an incident of Prohibited Conduct to a Mandatory Reporter but decline to disclose the identity of the Respondent; in that case, the University will offer Interim Measures to the Complainant, but the University's ability to investigate the incident and pursue disciplinary action against the Respondent or take other remedial action will be limited….

Because Mandatory Reporters have an obligation to report information they receive about Prohibited Conduct (and take other responsive actions), one of the purposes of this Section 3.1 is to inform students, employees and other persons about which University employees are Mandatory Reporters so that students, employees and other persons can make informed decisions about whether to disclose information to those University employees. Whether an employee is a Mandatory Reporter will vary based on factors such as the Complainant and the Respondent (i.e., whether they are students, employees, and/or persons who are neither students nor employees) and the employee's authority to address violations of this policy. **Appendix B and Appendix C identify the University's Mandatory Reporters**. **Questions concerning whether a particular employee is a Mandatory Reporter should be directed to the Title IX Coordinator.**

**Mandatory Reporters are not confidential University resources like the Confidential Employees identified in** Section 4.1.1. Nevertheless, information communicated to a Mandatory Reporter will initially be shared only within the limited circle of those University employees whom the University reasonably needs to involve in the University's response to an incident of Prohibited Conduct, except as required by law (**Section 3.3**) and subject to the University granting a Complainant's Request for Limited Action (**Section 3.1.5**). Information about the report may need to be shared with the Respondent and witnesses in order to ensure a thorough investigation of the incident. However, information will not be shared with the Respondent or witnesses if the University grants a Complainant's Request for Limited Action (**Section 3.1.5**). In accordance with FERPA, Mandatory Reporters who are not employees of UTPD will not share personally identifiable information with UTPD or any other law enforcement agency without a Complainant's written consent or unless required by law.

(University's 2016 Policy, Section 3.1., *Exh. A*, at pp. 14-15 (**emphasis in original**)

(**emphasis in original**) (***emphasis added***)).

12

41. This "Mandatory Reporter" (Dr. Essif) designation in the 2016 Policy is in contrast to a

"Respondent" (Dr. Romeiser), which is defined to be:

>…[a] person or registered student organization **who has been accused of committing Prohibited Conduct**.  This term does not imply pre-judgment concerning whether the person or registered student organization committed Prohibited Conduct.

(University's 2016 Policy, *Exh. A*, Appendix A, p. 56 (**emphasis added**)).

42. The term "Prohibited Conduct" is defined by the 2016 Policy as: "Sexual Misconduct,

Relationship Violence, Stalking, and/or Retaliation."  (*See* University's 2016 Policy, *Exh. A*,

Appendix A, p. 55).

43. At no time did Dr. Essif engage in "Prohibited Conduct" nor has been accused of engaging in

"Prohibited Conduct" as defined by the 2016 Policy:

This policy prohibits the following conduct defined in Section 2.1 or Appendix A:

- **Sexual Misconduct**
  - **Sexual Assault**
  - **Sexual Harassment**
  - **Sexual Exploitation**
  - **Sex Offense Crime**
- **Relationship Violence**
  - **Dating Violence**
  - **Domestic Violence**
  - **Relationship Violence Crime**
- **Stalking**
- **Retaliation**


### 2.1  Definitions of Prohibited Conduct

**Sexual Misconduct**:    A term that encompasses Sexual Harassment, Sexual Assault, Sexual Exploitation, and all other words and/or conduct that would constitute a Sex Offense Crime.

**Sexual Assault**:    Engaging in Sexual Conduct or Sexual Intercourse with another Person without the Consent of that person.

**Sexual Contact**:    The intentional touching of another person (including another person's clothing) in a sexual manner with any part

13

of one's body or with any object.  Sexual Contact also includes intentionally causing another person to touch themselves (including their clothing) in a sexual manner. Whether a touching was done in a sexual manner is determined from the perspective of a sober, objectively reasonable person in the same situation and with the same sex, gender identity, and sexual orientation as the person who was touched.

….

**Sexual Harassment**:     Sexual Harassment is a form of Sex Discrimination.  To determine whether conduct constitutes Sexual Harassment, consideration shall be given to the totality of the circumstances, including without limitation: the context in which the conduct and/or words occurred; and the frequency, nature, and severity of the conduct and/or words.

….

With respect to <u>an employee's conduct</u>, Sexual Harassment means conduct prohibited by *University of Tennessee Human Resources Policy 0280 ("Sexual Harassment and Other Discriminatory Harassment"* ***policy.tennessee.edu/hrpolicy/hr280/***)

(University's 2016 Policy, *Exh. A*, Section 2.1 at pp. 6-7).

44. Accordingly, given that Dr. Essif has never engaged in Prohibited Conduct under the 2016 Policy nor has he been accused of such by Jane Doe or any other complainant, under no circumstances can he be considered to be or have been a Respondent for purposes of the 2016 Policy or any policy thereafter.  Rather, Dr. Romeiser would be the party to whom the term "Respondent" would apply, having allegedly engaged in Prohibited Conduct according to Jane Doe's 2020 Complaint to the University.

45. The 2016 Policy also contains an ambiguous provision purporting to discipline "employees" of the University who violate the 2016 Policy, but such provision is listed under the heading: "Discipline for Prohibited Conduct" thereby indicating that such discipline is only applicable

to those employees who have engaged in Prohibited Conduct, which again is inapplicable to

Dr. Essif under all the circumstances:

### 2.3. Discipline for Prohibited Conduct

....

Prohibited Conduct committed by employees violates standards of conduct that have been established in existing University policies, including without limitation, the **University's Nondiscrimination Statement (oed.utk.edu/statement**/), **University of Tennessee Human Resources Policy 0280 (Sexual Harassment and Other Discriminatory Harassment) (policy.tennessee.edu/hr_policy/hr0280/**), and **University of Tennessee System Human Resources Policy 0580** (Code of Conduct) (**policy.tennessee.edu/hr_policy/hr0580/**). This policy supplements existing University standards of conduct in order to be more specific concerning the University's prohibition of Sexual Misconduct, Relationship Violence, Stalking, and Retaliation. Employees who violate this policy will be subject to disciplinary action, up to, and including, termination of employment, in accordance with University policies, including, without limitation, **University of Tennessee Human Resources Policy 0525** (Disciplinary Action) (**policy.tennessee.edu/hr_policy/hr0525/**), **University of Tennessee System Human Resources Policy 0640** (Grievances) (**policy.tennessee.edu/hr_policy/hr0640/**), and the **University of Tennessee Knoxville Faculty Handbook (provost.utk.edu/faculty-handbook/**).

(University's 2016 Policy, *Exh. A,* Section 2.3, p. 12).

46. Accordingly, the potential repercussions for any purported violation of the 2016 Policy by the Plaintiff as a Mandatory Reporter are not provided for in the 2016 Policy. (*See Exh. A*).

47. Upon information and belief, at the time of the incident that occurred between Jane Doe and Dr. Romeiser in 2016, the University had not yet formally established its Office of Title IX, which would not come into formal existence until the Fall semester of 2017. The University had unveiled its "Policy on Sexual Misconduct, Relationship Violence, and Stalking" approximately one (1) year prior, on or about August 19, 2015, and the UT Council for Diversity & Interculturalism at the University published an article indicating that it began "introducing" training about the policy during that same semester. A copy of the August 19, 2015 article published by the University is attached hereto as *Exhibit C*. (*See also* 2016

Policy, *Exh. A*).

48. Dr. Essif does not recall ever receiving training by the University that would indicate mandatory reporting of the extremely limited information he received from Jane Doe in 2016 as her account of the incident in September 2016 did not indicate that Dr. Romeiser's actions amounted to Prohibited Conduct requiring an official report.

49. During the relevant time period, the University also published a video on YouTube featuring Ashley Blamey, Deputy Title IX Director and Director of the University's Center for Health, Education, and Wellness, regarding student rights in the context of the University's Policy on Sexual Misconduct, Relationship Violence, and Stalking wherein the University promised confidentiality to its students in terms of reporting.

(https://www.youtube.com/watch?v=AsZvz8u3GvU).  In fact, in minute 0:51 of this video, the University explicitly promises students: "The University community also offers any level of confidentiality that you would like."  (*See*

*https://www.youtube.com/watch?v=AsZvz8u3GvU* at Minute 0:51).  Accordingly, in 2016, when Jane Doe approached Dr. Essif, Jane Doe's expectation of anonymity was reasonable and Dr. Essif's intention to maintain her anonymity was reasonable, particularly given the information and promises disseminated by the University at that time.

**Emeritus Status vests in Dr. Essif and good rapport between Dr. Essif and Jane Doe following Dr. Essif's retirement**

50. Dr. Essif continued to work at the University throughout the Fall semester of 2016.  Jane Doe continued her studies as a Master's student and she and Dr. Essif maintained the rapport that had led to her trust in him and to approach him in September 2016 regarding the situation with Dr. Romeiser.  Dr. Essif encouraged Jane Doe to expand her studies into other disciplines that interested her, including the humanities and theatre.

51. After having served the University for nearly twenty-three (23) years, in the spring of 2017, Dr. Essif decided to retire in order to spend more time with his grandchildren.

52. On or about May 2, 2017, Defendant John P. Zomchick, then-Interim Provost and Senior Vice Chancellor of the University, sent Dr. Essif a letter on behalf of the University, acknowledging that Dr. Essif "earned" the rank of Professor Emeritus upon his retirement, which was set to occur on or about July 1, 2017. Dr. Zomchick further congratulated Dr. Essif and thanked him for his service to the University. A copy of the letter is attached hereto as *Exhibit D*.

53. Dr. Essif earned the rank of Professor Emeritus and such title was granted following recommendations from his then-department head Dr. Del Caro and Defendant Lee as the Dean of the College of Arts and Sciences.

54. According to its policies, the University does not and in 2017 did not award emeritus status as a matter of course to professors upon their retirement. Rather, it is a title that is earned, thereby vesting in a professor upon bestowment. The policy set forth in the 2016 University of Tennessee, Knoxville Faculty Handbook published by the University reads as follows:

> 3.2.1    Rank of Emeritus or Emerita
>
> At the discretion of the chancellor and upon the recommendation of the department head, dean, and chief academic officer, faculty members who are professors at the time of retirement may be awarded the rank of emeritus or emerita. In special cases of long and meritorious service, persons who have retired with the rank of associate professor or assistant professor may also be awarded the rank of emerita or emeritus.

> (2016 University of Tennessee, Knoxville Faculty Handbook, Section 3.2.1, attached hereto as *Exhibit E*).

55. Notably absent from the University's policy on "Rank of Emeritus or Emerita," under which the Defendants purportedly acted against Dr. Essif in 2021 is a provision or procedure for any potential withdrawal of the title under any circumstances.

56. Dr. Essif retired as of July 1, 2017 with the title of Professor Emeritus.

57. Upon his retirement in 2017, Dr. Essif also became eligible to receive certain retiree benefits as published by the University, including, but not limited to, a retiree identification card, email continuation, an on-campus parking pass, and library access and privileges. A copy of the retiree benefits published by the University and distributed to Dr. Essif at the time of his retirement in 2017 is attached hereto as *Exhibit F*.

58. Since his retirement and prior to the Defendants' actions, Dr. Essif has used and reasonably relied upon his vested retiree privileges and title in order to publish books and articles as Professor Emeritus of the University, continuing to bestow honor and recognition upon the University. Said Professor Emeritus status has allowed him to publish in higher-level journals such as *Modern Drama*.

59. After Dr. Essif's retirement, Jane Doe continued to maintain a friendly relationship with him and communicate via email.

60. On or about March 1, 2018, at Jane Doe's request, Dr. Essif agreed to serve as an employment reference for her. Jane Doe responded to him on or about March 5, 2018 regarding her ongoing coursework and also sent him a copy of a one-act play she had written, asking him for his thoughts on it.

61. Dr. Essif read Jane Doe's one-act play and responded to her via email on or about March 16, 2018, telling her he enjoyed the play and giving her his thoughts. Jane Doe replied on or about March 20, 2018, writing that she appreciated Dr. Essif's feedback and that she was

happy to know he enjoyed her play.

62. Dr. Essif maintains that his relationship with Jane Doe after their meeting in September 2016 was one of continued good rapport, trust, and respect, contrary to what Jane Doe claimed in 2020.

63. On or about November 19, 2019, Dr. Essif and his wife moved to Carrboro, North Carolina, to be near their daughter and her children. Just prior to the move, Dr. Essif notified Pamela Hughes, the business manager of the Department of Modern Foreign Languages and Literatures at the University of his new address in North Carolina.

64. Following his move to North Carolina, Dr. Essif continued to research and publish as Professor Emeritus of the University.

**Dr. Essif's 2020 Health Issues, Jane Doe's June 2020 Facebook Post, and the University's Investigation Against Dr. John Romeiser**

65. On or about April 6, 2020, Dr. Essif began experiencing extreme pain in his chest and esophagus and was unable to swallow. He was subsequently hospitalized at the University of North Carolina Hospital in Chapel Hill, North Carolina where he underwent surgery to temporarily clear his esophagus.

66. Dr. Essif was diagnosed with Type 2 achalasia, which is a lack of motility in the esophagus, along with aspiration pneumonia, and underwent a second surgery before being discharged from the hospital. He continued to deal with his achalasia through the summer and fall of 2020.

67. Meanwhile, on or about June 20, 2020, Jane Doe posted to her Facebook social media page a much more detailed and elaborate version of the 2016 encounter with Dr. Romeiser than the limited account she relayed to Dr. Essif in 2016. Her 2020 account of the incident also differed significantly from what she told Dr. Essif in 2016.

Jane Doe wrote the following in her Facebook post, in relevant part:

> John Romeiser, a professor in the French department at UTK, is a sexual predator.
>
> When I was a student in the MA program, he pulled me aside at an event for grad students and faculty of the French department, told me to sit down in a chair next to him, and grabbed my thigh. He had clearly had too much to drink and he started telling me details about his sex life that I certainly did not ask for, and he stated that he saw me as one of his "girlfriends." I felt so humiliated and uncomfortable. I didn't know how to respond, knowing that the entire department was right outside the room. Before this event, he had made multiple unwanted comments to me about how I looked in certain clothes and told me explicit details about his relationships with different women. He had written a recommendation for a scholarship for me, and then implied that I owed him something for it.
>
> When I spoke up about it, I was encouraged not to go through the usual sexual harassment reporting system at the university. I was encouraged by a professor I used to trust to handle it within the department. I did what I was told, and to no one's surprise, nothing was done. I was even encouraged to keep taking classes with him.

(Jane Doe's June 20, 2020 Facebook post as reproduced by Jane Doe in an email to the dean of the College of Arts and Sciences on June 20, 2020, attached hereto as *Exhibit G*).

68. Upon information and belief, at that time, Jane Doe also sent an email to the dean of the College of Arts and Sciences at the University with a copy of her Facebook post along with additional allegations about Dr. Romeiser and the Department of Modern Foreign Languages and Literatures that served as the basis of the Title IX Complaint and investigation against Dr. Romeiser. However, a copy of Jane Doe's email/Title IX Complaint was not provided to Dr. Essif until after Mr. Meanza with OED requested that Dr. Essif give his account of the incident. A copy of the email that served as the basis for Jane Doe's 2020 Title IX Complaint is attached hereto as *Exhibit G*.

69. Notably, in Jane Doe's 2020 Title IX Complaint, she references an alleged sexual assault involving Dr. Romeiser and another woman wherein that woman insisted on confidentiality and anonymity, which Jane Doe indicates she is expecting in exactly the same manner she

requested Dr. Essif to act in 2016.   (*See Exh. G*).

70. Upon information and belief, the Office of Equity and Diversity ("OED") at the University instituted an investigation against Dr. Essif, despite the fact that he was not the subject and/or the Respondent of Jane Doe's Title IX Complaint regarding Dr. Romeiser's actions.  Dr. Essif further was not named in said Title IX Complaint or in Jane Doe's Facebook post. (*See Exh. G*).

71. During the time period between April 2020 and December 2020, Dr. Essif's health continued to be quite poor as he was suffering from constant bouts of debilitating chest pain due to esophageal spasms that mimic the symptoms of a heart attack.  He underwent another surgery on or about September 10, 2020.

72. Dr. Essif recalls receiving an email in his account maintained by the University at some point during the summer of 2020, indicating there was an ongoing investigation being carried out against his former colleague, Dr. Romeiser, involving the 2016 incident.  However, given that Dr. Essif was not the perpetrator involved and his role had been to try to help Jane Doe, based on what was written in the email, Dr. Essif did not understand that this investigation could involve him as a potential party against whom the University proposed to be taking any action or that the investigation itself could affect his rights.

73. On or about December 10, 2020, Dr. Essif received an email in his email account maintained by the University from Angie Cross of the University with the subject line: "Emeritus revocation letters from Provost" and two letters attached that Ms. Cross indicated were sent on behalf of University's Provost, Dr. John Zomchick.  Noticeably absent was a copy of the complaint lodged against Dr. Essif.  A copy of the email and its attachments are attached hereto as *Collective Exhibit H*.

74. The two letters attached to the December 10, 2020 email were dated October 23, 2020 and December 8, 2020. Notably, the December 8, 2020 letter was addressed to Dr. Essif at his Knoxville address, where he had not resided for more than a year despite the fact that he updated the University with his change of address at the time he moved to Carrboro, North Carolina in November 2019. (*See Collective Exhibit H*).

75. The October 23, 2020 letter was from Defendant Theresa Lee, Professor and Dean of the College of Arts and Sciences to John Zomchick, Provost and Senior Vice Chancellor of the University. Also copied on the letter were Diane Kelly, Vice Provost for Faculty Affairs and Andrew Kramer, Associate Dean for Academic Personnel, College of Arts and Sciences at the University. The subject line for the October 23, 2020 letter was: "Recommending removal of 'emeritus' faculty title – Dr. Les Essif". (*See Coll. Exh. H*).

76. In Dean Lee's October 23, 2020 letter, which was not sent to Dr. Essif until on or about December 10, 2020, Dean Lee indicated that she had formally accepted the report generated by the Office of Equity and Diversity ("OED") at the University dated August 20, 2020, "including the OED conclusion that Dr. Essif violated the university's then-applicable (2016) Policy on Sexual Misconduct, Relationship Violence, and Stalking." (*See Coll. Exh. H*). She further stated that she accepted the following OED conclusions:

> 1. Failed to report to Title IX officials an allegation of prohibited conduct asserted by a graduate student against a departmental colleague;
>
> 2. Improperly demanded confidentiality when he partially disclosed the allegation to his department head, while still asking the head to take measures to protect the complainant against further harm; and
>
> 3. Actively dissuaded the graduate student from reporting the prohibited conduct through proper channels (Title IX or OED).

(*Coll. Exh. H*).

77. Dean Lee's October 23, 2020 letter also stated that, as the basis for her recommendation for revocation of Dr. Essif's emeritus status, she was relying upon Section 3.2.1 of the University's Faculty Handbook, which is devoid of any process for revocation or withdrawal of an emeritus title:

> Following the same process described in Section 3.2.1 of the Faculty Handbook, I am recommending and requesting that the Chancellor withdraw the title of Professor Emeritus from Dr. Essif, and ask that you notify Dr. Essif of the revocation of the title. It is my understanding that, as a retired faculty member, Dr. Essif will maintain certain retiree benefits and privileges. As such, he should identify himself as a retired faculty member (particularly when using a University email account) but would no longer be allowed to identify himself as Professor Emeritus or to claim any ongoing affiliation with the University.

(*Coll. Exh. H; See also* 2020 University of Tennessee, Knoxville Faculty Handbook, Section 3.2.1, attached hereto as *Exhibit I*).

78. The December 8, 2020 letter attached to the December 10, 2020 email was from Defendant Zomchick. In that letter, Defendant Zomchick indicated that he had conferred with Defendant Plowman and they concurred with Defendant Lee that Dr. Essif's emeritus title be withdrawn. Defendant Zomchick's letter further outlined the revocation of retiree benefits that effectively banned Dr. Essif from the University's campus:

> In addition, I concur with [Defendant Lee]'s recommendation that certain university benefits provided to retirees will be withdrawn. Specifically: you are no longer permitted to access academic buildings; to retain a university e-mail account; you are ineligible for retiree parking benefits; you are no longer eligible to purchase event tickets at the faculty/staff/retiree rate; and you are not eligible for membership at TRECS. Appropriate university offices will be advised that you are no longer eligible for these benefits. You may receive notices from appropriate offices as specific privileges have been terminated.

(*Coll. Exh. H*).

79. As he was not the respondent or the perpetrator of the allegations of sexual harassment, Dr. Essif was completely blindsided and horrified by the information in the emails and letters. The entire alleged procedure carried out by the Defendants had essentially convicted and

punished him *in absentia* as it had gone on without notice of a complaint against him as an actual respondent (because he was not a "Respondent" as defined by the University's policies), an opportunity for a fair hearing, and sanctioned him pursuant to a non-existent procedure by virtue of the removal of his earned and vested title along with certain retiree benefits.

80. On or about December 16, 2020, Dr. Essif sent a letter via email to Defendant Zomchick and Mr. Meanza at University wherein he indicated his shock, surprise, and dismay at the Defendants' actions and stated his recollection of the 2016 events. Dr. Essif further indicated that he was responding "without the benefit of knowing the actual complaint against [him]" and specifically reserved the right to a fair hearing in which to clear his name:

> Since I'm submitting my account without benefit of knowing exactly what I've been accused of and by whom, if any part of my account does not correspond to reports made by any other respondent or complainant in the case, I fully expect that I will be given every opportunity to make a complete response to any specific accusations against me. I reserve the right to be both fully informed and fully heard. I expect to have the opportunity to respond to any further questions you may have, via email, phone, or, if you prefer, Zoom….

(Dr. Essif Dec. 16, 2020 Email to Defendant Zomchick and Nick Meanza, attached hereto as part of *Collective Exhibit J*).

81. Thereafter, Dr. Essif retained counsel and the University agreed to reopen the investigation to allow Dr. Essif to submit a statement to OED for its investigation.

82. On or about February 3, 2021, counsel for Dr. Essif sent a letter to counsel for the University outlining Dr. Essif's position with respect to the events that transpired in 2016 as well as his position that the University did not act in accordance with its policies in its attempt to summarily revoke Dr. Essif's Emeritus status.

83. On or about March 12, 2021, Dr. Essif, his counsel, Mr. Meanza, and counsel for the University participated in a Zoom conference for the purposes of the OED investigation. During this Zoom conference, the University took the position that counsel for Dr. Essif could only take on a passive role and simply be present while Dr. Essif interacted with Mr. Meanza, the Assistant Director of Investigations at OED, whose role was to conduct an interview for investigative purposes and ***not*** as a decision-maker.

84. During the March 12, 2021 Zoom conference, wherein counsel for the University prohibited counsel for Dr. Essif from objecting or making argument on behalf of Dr. Essif, Dr. Essif answered OED's questions and spoke about how the University's prior actions in attempting to revoke his Professor Emeritus status had detrimentally affected him. Dr. Essif further tried to explain how Jane Doe's 2020 account of the events differed significantly from her account as relayed to him in 2016.

85. The March 12, 2021 Zoom conference with OED did not permit Dr. Essif to present witness testimony in support of Dr. Essif's position, to cross-examine his accuser, or to make argument on his behalf. Further, it was merely before an investigator and not before anyone with decision-making authority. Accordingly, this Zoom conference was not a full and fair hearing for purposes of affording Dr. Essif due process.

86. Upon information and belief, the OED investigation thereafter progressed with little to no updates to Dr. Essif or his counsel.

87. On or about April 1, 2021, counsel for Dr. Essif contacted counsel for the University regarding the status of the OED investigation. Several days later, counsel for the University responded that there was no update, but that she would follow up with OED.

88. On or about June 30, 2021, still having received no updates regarding the OED investigation, counsel for Dr. Essif again emailed counsel for the University to inquire.

89. On or about August 4, 2021, counsel for Dr. Essif still had not received a response from the University and again inquired via email for a status update. On or about August 9, 2021, counsel for the University replied to counsel for Dr. Essif and indicated that there had been some transition within OED and a new lead investigator had reviewed the case and was to issue a new report in the next few days. However, counsel for the University also expressed that she expected the outcome of the OED investigation to be the **same** as that of the first investigation. She further promised to provide counsel for Dr. Essif with a copy of the new OED report as soon as she received it. Copies of the August 4, 2021 and the August 9, 2021 emails are attached hereto as part of *Collective Exhibit K*.

90. On or about August 18, 2021, counsel for the University emailed counsel for Dr. Essif and indicated that she had reviewed a draft of the OED report that once again concluded that Dr. Essif had violated the policy and that she expected the same result to occur i.e. the revocation of Dr. Essif's Professor Emeritus status. A copy of that August 18, 2021 email is attached hereto as part of *Collective Exhibit K*.

91. On or about September 30, 2021, as he still had not heard anything further from the University, counsel for Dr. Essif again emailed counsel for the University, asking for an update and indicating that Dr. Essif still had not received a copy of the OED report. A copy of the September 30, 2021 email is attached hereto as part of *Collective Exhibit K*.

92. That same day, September 30, 2021, counsel for the University responded via email

indicating that she previously assumed OED would send a copy of its investigative report to

Dr. Essif, but:

> …this kind of report comes from Title IX (because it's a failure to report issue), so the process is different." Counsel for the University further indicated that she would "get [Dr. Essif's counsel] a copy asap and a copy of the dean's letter to the Provost renewing the request for removal of the emeritus title. I have also reminded the Provost that the dean's memo requires action, so he and the Chancellor will discuss it and a letter will be issued to Dr. Essif; I will be sure you get a copy.

(*Coll. Exh. K*, September 30, 2021 email). In a second email also dated September 30, 2021

(attached hereto as part of *Collective Exhibit K*), counsel for the University also included a

copy of the OED report dated August 18, 2021, attached hereto as *Exhibit L*, along with a

copy of the September 3, 2021 letter from Defendant Lee to Defendant Zomchick, attached

hereto as *Exhibit M,* wherein Defendant Lee made the same recommendation to revoke Dr.

Essif's Emeritus status.

93. Pursuant to the University's OED policies, if he were indeed categorized as a "Respondent,"

Dr. Essif should have received a draft copy of the OED Report *before* it was finalized and

submitted to Defendant Lee and/or other administrators within University so that he could

have an opportunity to provide clarifying comments of the summary report prior to the

finalization. (*See* OED Complaint Process Additional Information for Respondents, attached

hereto as *Exhibit N* and available at https://oed.utk.edu/complaints/information-for-

respondents/). This did not occur and, as a result, OED made several misstatements that Dr.

Essif never got the opportunity to explain, clarify, and/or refute.

94. According to the August 18, 2021 OED Report, which was authored by Nick Meanza,

Assistant Director of Investigations at OED and Katrice W. Jones Morgan, Interim Associate

Vice Chancellor and Director of OED, OED "reviewed a concern that Dr. Les Essif failed to

adhere to mandatory reporter obligations in accordance with university policy." (*See Exh. L*).

95. The OED Report further claimed that its conclusion that "Dr. Essif violated the [Defendant] University's then-applicable Title IX policy by failing to fulfill his obligations as a mandatory reporter and by dissuading a student from reporting to the campus Title IX office" was "based on a complete review of all available information[,]" despite the fact that no formal hearing had ever taken place. (*See Exh. L* at 1).

96. Instead, Mr. Meanza took Dr. Essif's statements during the March 2021 interview completely and totally out of context to make unfounded and wrongful conclusions regarding Dr. Essif's credibility in order to support the original OED findings, which is further violative of Dr. Essif's rights.

97. For example, the OED Report mentions a comment made by Dr. Essif during the March 2021 interview regarding Dr. Romeiser's "womanizing" behavior. Dr. Essif's "womanizing" comment specifically referenced in the OED Report was made *after* Dr. Essif had full knowledge of Jane Doe's allegations as reported to the University. Thus, it cannot and should not be used against him to justify any purported inaction in 2016 as the proof otherwise showed he did not have sufficient information at that time to make that determination. (*See Exh. L*).

98. Upon information and belief, sometime thereafter, again, without prior notice to Dr. Essif or his counsel, Defendant Teresa Lee, Dean of the College of Arts and Sciences at the University, reviewed the August 18, 2021 OED Report. In her September 3, 2021 letter to Defendant Zomchick, Defendant Lee made the same recommendation she made in her October 23, 2020 letter to revoke Dr. Essif's Professor Emeritus status. She again stated that she was relying upon Section 3.2.1 of the Faculty Handbook as the basis for her

recommendation for revocation, which is devoid of any process for revocation or withdrawal

of an emeritus title:

> Following the same process described in Section 3.2.1 of the Faculty Handbook, I am recommending and requesting that the Chancellor withdraw the title of Professor Emeritus from Dr. Essif, and ask that you notify Dr. Essif of the revocation of the title. It is my understanding that, as a retired faculty member, Dr. Essif will maintain certain retiree benefits and privileges. As such, he should identify himself as a retired faculty member (particularly when using a University email account) but would no longer be allowed to identify himself as Professor Emeritus or to claim any ongoing affiliation with the University.

(September 3, 2021 Letter, attached hereto as *Exhibit M; See also* excerpt from 2021

University of Tennessee, Knoxville Faculty Handbook, Section 3.2.1, attached hereto as

*Exhibit O*).

99. On or about October 5, 2021, following receipt of the September 30, 2021 email from the

University's counsel indicating that OED and Defendant Lee had taken the same position

relative to Dr. Essif that they had in 2020 in recommending to Defendants Zomchick and

Plowman that Dr. Essif's Emeritus status be revoked, counsel for Dr. Essif again emailed

counsel for the University regarding Dr. Essif's intent to appeal the recommendation by

Defendant Lee in accordance with the procedure set forth by the University in conjunction

with OED investigations. A copy of the October 5, 2021 email is attached hereto as part of

*Collective Exhibit P*.

100. Counsel for the University responded on October 5, 2021 and wrote the following:

> He will receive written notice when a decision is made regarding his emeritus appointment. **It is a decision by the Chancellor and therefor [*sic*] not appealable.** He has been provided due process. He admitted violating the policy (although he seems to think it shouldn't have applied to him)….

(October 5, 2021 email from counsel for University attached hereto as part of *Collective*

*Exhibit P*) (**emphasis added**).

101. On or about October 8, 2021, counsel for the University emailed counsel for Dr. Essif to inform them of the University's decision to withdraw Dr. Essif's Emeritus title as well as certain other privileges. This email also included a letter addressed to Dr. Essif from Defendant Zomchick on behalf of the University dated October 5, 2021, informing him of the revocation of his Emeritus title along with a copy of Defendant Lee's September 3, 2021 letter, recommending the revocation. Counsel for the University again specified that no appeal was available to Dr. Essif: "**The Decision by the Chancellor is final and unappealable**." (A copy of the October 8, 2021 email and its attachments are attached hereto as part of *Collective Exhibit P*) (**emphasis added**).

102. In the October 5, 2021 letter from Defendant Zomchick to Dr. Essif, which was not provided to Dr. Essif or his counsel until October 8, 2021, Defendant Zomchick indicated that, in addition to the revocation of his Emeritus status, certain retiree benefits previously provided to and vested in Dr. Essif were also being arbitrarily and capriciously withdrawn:

> ….Therefore, this letter provides notice that the emeritus title is withdrawn, and university systems will be updated to reflect that you are retired (rather than "emeritus"). In communications or biosketches, you may identify yourself as a retired faculty member, but you may no longer use the emeritus title.

> Specifically, you are no longer permitted to access academic buildings; to retain a university e-mail account; you are ineligible for retiree parking benefits; you are no longer eligible to purchase ticket events at the faculty/staff/retiree rate; and you are not eligible for membership at TRECS.

> Appropriate university offices will be advised that you are no longer eligible for these benefits….

(Oct. 5, 2021 letter from Defendant Zomchick to Dr. Essif, attached hereto as part of *Coll. Exh. P*).

103. The Defendants' revocation of Dr. Essif's Emeritus status and his retirement benefits, both of which were vested in him, has impaired Dr. Essif's reputation and severely

compromised his opportunity to continue publishing his research in respected journals and other publications.

104.    Even though Dr. Essif and his counsel, on separate occasions, requested a meaningful opportunity to clear his name and defend his reputation, the Defendants have not provided Dr. Essif with a meaningful opportunity to be heard.

105.    As a direct and proximate result of the Defendants' deprivations, Dr. Essif has suffered and continues to suffer humiliation, frustration, and sleeplessness, amounting to severe emotional distress and great mental anguish.  Presently, Dr. Essif is being treated for insomnia and complications of his esophageal disease, which his family physician and gastrointestinal surgeon believe are associated with the substantial anxiety resulting from the Defendants' actions.

106.    Defendants acted in a spiteful and malicious way and/or in conscious disregard of Dr. Essif's rights when they revoked his Emeritus status without a meaningful opportunity to be heard and in denying him a meaningful opportunity to clear his name and defend his reputation before or after they publicized the revocation of his Emeritus status on the University's website by removing Dr. Essif from the list of Professors Emeriti.

**The University's Policies, their inconsistencies, and the Defendants' misapplication thereof to Dr. Essif**

**The University's 2020 and 2021 Policies**

107.    In 2020 and 2021, the University has categorized Dr. Essif as a "Respondent," which is still inappropriate under its policies and under the facts and circumstances.  The 2016 as well as the 2020 and 2021 policies would have afforded an actual respondent far more rights than Dr. Essif has been afforded in this case, including the right to an actual hearing and to an

appeal, which the Defendants have arbitrarily and capriciously denied to Dr. Essif. (A copy of the 2020 Policy is attached hereto as *Exhibit Q* and a copy of the 2021 Policy is attached hereto as Exhibit R; *See also Exh. A* for the 2016 Policy).

108. The University's August 13, 2021 Policy on Sexual Harassment, Sexual Assault, Dating & Domestic Violence, and Stalking ("2021 Title IX Policy") specifies the following with respect to its application:

1.2.3   Effective Date

The effective date of this Policy is August 13, 2021. This Policy applies to all Prohibited Conduct reported to have occurred on or after August 13, 2021. If the Prohibited Conduct occurred prior [*sic*] August 13, 2021, then: (1) the report will be evaluated using definitions contained in applicable University policies in effect on the date the reported Prohibited Conduct occurred; and (2) other aspects of the University's response to the report (e.g., the grievance procedure) will be based on this Policy.

(University's 2021 Title IX Policy, Section 1.2.3 at p.2, attached hereto as *Exhibit R*).

109. Accordingly, as explained above, according to the 2021 Policy, in effect when the Defendants levied their arbitrary and capricious sanctions on Dr. Essif, because Jane Doe's allegations against Dr. Romeiser allegedly occurred in 2016, the definitions contained in the 2016 Policy are applicable. (*See* 2021 Title IX Policy, *Exh. R*). As explained above, Dr. Essif cannot be considered to be a Respondent pursuant to the 2016 Policy definitions.

110. Notably, during the pendency of the investigation involving Dr. Romeiser wherein the Defendants have arbitrarily and capriciously punished Dr. Essif as though he were the perpetrator, the University appears to have included a provision for the first time in its 2020 Title IX Policy, effective August 14, 2020, which is then carried over to its 2021 Title IX policy, to indicate that the Defendants may revoke emeritus status in certain circumstances wherein that person has been determined to have engaged in Prohibited Conduct, which is inapplicable to Dr. Essif:

**Possible Sanctions**

Following a determination that an employee is responsible for engaging in Prohibited Conduct, the appropriate University administrator (in a Non-Title IX Prohibited Conduct Complaint) or the Title IX Hearing Officer (in a Title IX Prohibited Conduct Complaint) will issue a sanction. Possible sanctions range from verbal warning to termination, and include: verbal or written warning, written reprimand or censure, suspension with or without pay, probation, demotion, removal or alteration of job responsibilities (and a corresponding loss of pay), and termination. A sanction for faculty members could also include revocation of tenure and revocation of emeritus status.

Any sanction imposed may be appealed as set forth above and in Appendix D-1. Once a sanction decision is final, the University will ensure the effective implementation of the final sanctions. The Title IX Coordinator is responsible for effective implementation of any remedies.

(*Exh. R*, 2021 Title IX Policy, Appendix D at p.54 (**emphasis in original**); *See also Exh. Q*, 2020 Title IX Policy).

111.    The Defendants' actions in revoking Dr. Essif's Emeritus status, whether under this new 2021 Policy or otherwise, are unsupported by any policy and are further arbitrary and capricious as he has not nor has there been any determination that he engaged in Prohibited Conduct as defined in either the 2016 Policy, the 2020 Policy, or the 2021 Policy.

112.    Upon information and belief, in addition to categorizing Dr. Essif as a Respondent, the Defendants further categorize him as Mandatory Reporter under the 2021 Policy.

113.    Pursuant to the 2021 Policy, Mandatory Reporters are defined and their duties are described as follows:

4.5.2.1 Mandatory Reporters

A Mandatory Reporter is a University official who is required to report information about known or suspected Prohibited Conduct to a Title IX Official, whether the employee received the information by means of a complaint, report, personal observation, or otherwise, including information learned from third parties. **A University employee is almost always a Mandatory Reporter when either the Complainant or Respondent is a student**. Employees who have questions about their reporting responsibilities, or students who have questions about an employee's reporting responsibilities, should contact the Title IX Coordinator.

**<u>A University employee is a Mandatory Reporter if either of the following apply</u>:**

**(1)** The Prohibited Conduct **involves either a Complainant who is a student or a Respondent who is a student.**

**OR**

**(2)** The employee is the **supervisor of either a Complainant who is an employee or a Respondent who is an employee,** or otherwise has the authority to redress the Prohibited Conduct (e.g., human resources administrators, OED employees, Title IX Officials, department heads, deans, vice chancellors, chancellors, vice presidents, campus police).

**....**

Mandatory Reporters are required to inform a Title IX Official about all information known to them about the Prohibited Conduct. Failure to adhere to one's duty to report Prohibited Conduct to a Title IX Official may result in disciplinary action, up to and including termination of employment.

The Title IX Coordinator or designee will evaluate allegations that a Mandatory Reporter failed to report Prohibited Conduct to a Title IX Official. In evaluating those allegations, the Title IX Coordinator or designee may meet with the Complainant, the Mandatory Reporter, the Mandatory Reporter's supervisor or campus unit, and other witnesses who can provide information. The Title IX Coordinator or designee will determine whether further investigation is warranted on a case-by-case basis, including but not limited to, the Mandatory Reporter's role within the University; the nature and scope of the suspected Prohibited Conduct; and the risk to the University community if the report of Prohibited Conduct were substantiated. The Title IX Coordinator may recommend additional education and training and other remedial or corrective actions.

In some cases, the Title IX Coordinator or designee may refer the allegations that a Mandatory Reporter failed to report Prohibited Conduct to the Office of Equity & Diversity, which will conduct an investigation. OED will make findings of fact and determine whether, by a preponderance of the evidence, a Mandatory Reporter failed to report Prohibited Conduct. The Title IX Coordinator and the appropriate University administrator will review the findings. The administrator will determine in writing whether to accept OED's findings and conclusion and may include a description of remedial or corrective actions the University will implement. The Title IX Coordinator may also recommend remedial or corrective actions.

(*Exh. R*, 2021 Policy, Section 4.5.2.1, Mandatory Reporters, pp. 14-15).

114.    Notably, under the 2016 Policy, the definition for a Mandatory Reporter specifies that he or she is required to report instances of actual Prohibited Conduct as opposed to suspected Prohibited Conduct as is now required in the 2021 Policy.  (*See Exh. A* and *Exh. R*).  In contrast, pursuant to the 2021 Policy, a Mandatory Reporter "…is required to report information about **known or suspected** Prohibited Conduct to a Title IX Official…" (*Exh. R*, 2021 Policy, Section 4.5.2.1 at p. 13) (**emphasis added**).  The limited information communicated from Jane Doe to Dr. Essif in 2016 was insufficient for him to determine that the encounter between Jane Doe and Dr. Romeiser amounted to Prohibited Conduct that would trigger a mandatory report pursuant to the 2016 Policy.  Accordingly, Dr. Essif acted appropriately in 2016 and he cannot be held responsible under the 2021 Policy.

115.    Upon information and belief, the Defendants seek to retroactively sanction Dr. Essif for his alleged failures as a Mandatory Reporter, pursuant to the 2021 Policy.  Such attempt at retroactively sanctioning Dr. Essif is inherently unfair as Dr. Essif, in 2016, did not have an opportunity to know what the 2021 policy would be nor to conform his conduct accordingly.

116.    Accordingly, by the time *any* information from the University was given to Dr. Essif, the recommendation to revoke Dr. Essif's emeritus status had already been made by Defendant Lee in her September 3, 2021 letter to Defendant Zomchick.  (*See Exh. N*).

117.    On or before October 21, 2021, the University had already removed Dr. Essif from the list of Professors Emeriti in the Department of Modern Foreign Languages and Literatures on its website thereby making the revocation public.

## COUNT I
## INJUNCTIVE RELIEF
### (Federal and State Law)

### VIOLATION OF PLAINTIFF'S FEDERAL PROCEDURAL AND SUBSTANTIVE DUE PROCESS RIGHTS
### (42 U.S.C. § 1983; 42 U.S.C. § 1988; Fourteenth Amendment to the United States Constitution)

118.    Dr. Essif incorporates Paragraphs 1 through 117 as though fully set forth herein.

119.    Dr. Essif has a constitutionally protected property interest in his Professor Emeritus status and retiree benefits earned by him and vested in him on or about May 2, 2017.

120.    Dr. Essif has a constitutionally protected property interest in his positions as a researcher and as a scholar and writer.

121.    Dr. Essif has a constitutionally protected liberty interest in pursuing his chosen profession as a retiree (including researching and publishing), in his continued livelihood as a retiree continuing to research and publish, and in his reputation, good name, honor, integrity, character, and professional standing.

122.    As more fully set forth above, Defendants' actions have violated Dr. Essif's rights against deprivation of his property and/or liberty interests without due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution.

123.    As more fully set forth above, Defendants' actions were carried out without cause and/or for reasons that were arbitrary and capricious.

124.    As more fully set forth above, the Defendants' actions in ratifying, affirming, and/or implementing the actions against Dr. Essif by the University's agents, representatives, and employees, the Defendants acted in an arbitrary and capricious manner.

125.    As more fully set forth above, the Defendants' actions violated Dr. Essif's due process rights to be free from arbitrary and capricious deprivations of property under the Fourteenth

Amendment of the United States Constitution.

126.    As more fully set forth above, the constitutional violations against Dr. Essif are of a continuous and ongoing nature.

127.    In taking the actions against Dr. Essif, as set forth more fully above, the Defendants acted intentionally, willfully, maliciously, and unlawfully without providing procedural and substantive due process rights to Dr. Essif as is required by law.

128.    As more fully set forth above, Defendants' actions have violated Dr. Essif's rights against deprivation of his property and/or liberty interests without due process of law as guaranteed by Article I, Section 8 of the Constitution of the State of Tennessee.

129.    As more fully set forth above, the Defendants' actions violated Dr. Essif's due process rights to be free from arbitrary and capricious deprivations of property under Article I, Section 8 of the Constitution of the State of Tennessee.

130.    As more fully set forth above, the constitutional violations against Dr. Essif are of a continuous and ongoing nature.

131.    In taking the actions against Dr. Essif, as set forth more fully above, the Defendants acted intentionally, willfully, maliciously, and unlawfully without providing procedural and substantive due process rights to Dr. Essif as is required by law.

132.    As more fully set forth above, due to the Defendants' actions, Dr. Essif has suffered immediate and irreparable injury and will continue to so suffer in violation of his rights unless the Defendants are enjoined from such activity by order of this Court.

133.    Dr. Essif has no adequate remedy at law or otherwise to address his non-monetary injuries, except in a court of equity.

134. The public interest would be best served by ensuring that the Defendants are enjoined from ongoing and future illegal actions against Dr. Essif.

135. No previous application for extraordinary relief has been made by Dr. Essif against the Defendants nor has an injunction been refused by any court.

**CLAIM FOR RELIEF**

136. Paragraphs 1 through 135, above, are realleged and incorporated herein.

137. By acting under color of law in denying the Plaintiff notice and a meaningful opportunity to be heard when they revoked his Professor Emeritus status and certain retiree benefits, and in denying him a meaningful opportunity to clear his name and defend his reputation before or after they publicized the revocation of his Emeritus status, the Defendants denied the Plaintiff due process to which he was due in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 8 of the Tennessee Constitution. The Plaintiff is further entitled to his attorney's fees pursuant to 42 U.S.C. § 1988.

**PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing, Plaintiff prays that this Court:

A. Seat a jury to try this cause;

B. Declare that the Defendants have violated Article I, Section 8 of the Constitution of the State of Tennessee, the Fourteenth Amendment to the United States Constitution, and 42 U.S.C. § 1983;

C.  Order such equitable and injunctive relief, including reinstatement of the Emeritus title and the Plaintiff's full array of retiree benefits, expungement, and meaningful name-clearing opportunity, as will make him whole for Defendants' deprivations; costs; attorneys' fees; and

D.  Grant such other, general, further, and just relief as the Court may deem appropriate.

**THIS IS THE FIRST APPLICATION FOR EXTRAORDINARY PROCESS IN THIS CAUSE.**

Respectfully submitted this the 24th day of June, 2022,

*/s/ Jerrold L. Becker*
JERROLD L. BECKER (BPR #001239)
(*jbecker@bwblawyer.com*)
EMILY K. STULCE (BPR #028351)
(*estulce@bwblawyer.com*)
BUNSTINE, WATSON & BECKER
First Horizon Plaza
800 S. Gay Street, Suite 2001
Knoxville, TN  37929
(865) 523-3022
(865) 637-0137 (FAX)

ATTORNEYS FOR PLAINTIFF

## JURY DEMAND

Plaintiff requests a jury to try this cause.

/s/ Jerrold L. Becker
_____

JERROLD L. BECKER (BPR #001239)
(*jbecker@bwblawyer.com*)
EMILY K. STULCE (BPR #028351)
(*estulce@bwblawyer.com*)
BUNSTINE, WATSON & BECKER
First Horizon Plaza
800 S. Gay Street, Suite 2001
Knoxville, TN 37929
(865) 523-3022
(865) 637-0137 (FAX)

ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 24, 2022, the foregoing Amended Complaint was filed using the Court's electronic filing system and a copy will be served upon all counsel of record, including the following, via the Court's CM/ECF system:

Michael D. Fitzgerald
Associate General Counsel
505 Summer Place, UT Tower #1155
Knoxville, TN  37902
mike.fitzgerald@tennessee.edu

*/s/ Jerrold L. Becker*
JERROLD L. BECKER (BPR #001239)
(*jbecker@bwblawyer.com*)
EMILY K. STULCE (BPR #028351)
(*estulce@bwblawyer.com*)
BUNSTINE, WATSON & BECKER
First Horizon Plaza
800 S. Gay Street, Suite 2001
Knoxville, TN  37929
(865) 523-3022
(865) 637-0137 (FAX)

ATTORNEYS FOR PLAINTIFF